**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| OK YEON YOON, | Case No. 3:17CV2517 |
| Plaintiff, | |
| v. | **OPINION** |
| K-LIMITED CARRIER, LTD., et al, | |
| Defendants | |

| | |
|---|---|
| MYONG CHANG, | Case No. 3:18CV649 |
| Plaintiff | |
| v. | **OPINION** |
| K-LIMITED CARRIER, LTD., et al, | |
| Defendants | |

This matter relates to two cases arising from a tractor-trailer crash in South Dakota. The driver, Guy Haggard, died after he lost control of the tractor-trailer. Plaintiffs Myong Cha Chang and Ok Yeon Yoon, South Korean citizens and residents, filed nearly identical complaints against Haggard's estate and his employer, K-Ltd., alleging negligence against Haggard's estate, K-Ltd.'s vicarious liability for Haggard's actions, negligence *per se as* to both defendants, strict liability as to K-Ltd., and negligent hiring as to K-Ltd.

Defendants filed motions for summary judgment. (Docs. 18, 20, 33, 34). The parties have fully briefed the issues. Based on the analysis below, I grant in part, and deny in part, the defendants' motions for summary judgment.

**BACKGROUND**
**1. The Accident**

On the morning of July 15, 2016, Guy Haggard was driving K-Ltd.'s tractor-trailer westbound near mile marker 138 on Interstate 90 North ("I-90N") in Jackson County, South Dakota near mile marker 138. Doc. 33-1, PageID 236. He was traveling at 65 mph with the cruise control on. Doc. 33-6, PageID 370.

As Haggard took the Scenic Overlook exit, he lost control of the tractor-trailer halfway up the ramp. Doc. 33-1, PageID 236. The tractor-trailer hit a curb, rolled onto its passenger side, and slid into a Toyota Corolla parked at the north end of the Scenic Overlook parking lot. *Id.* The Toyota struck plaintiffs. *Id.* The tractor-trailer hit another curb and rolled completely before coming to rest. *Id.* Life Flight responders transported the plaintiffs to the Rapid City Regional Hospital. *Id.*

First responders tended to Haggard. Doc. 33-1, PageID 206. Haggard was not wearing his seatbelt. *Id.* at PageID 234. The force of the crash had propelled him into the truck's sleeper berth. *Id.* He was unresponsive and breathing at a rate of 12 breaths per minute. *Id.* at PageID 207. His pulse, 64 beats per minute, was barely perceptible. *Id.*

Extrication was prolonged. *Id.* Haggard stopped breathing before paramedics were able to remove him from the vehicle. Using a bag-valve mask, they began suction and ventilation. *Id.* They secured Haggard to a backboard with spider straps and lifted him out of the truck. *Id.*

In the ambulance, he was in asystole rhythm. *Id.* After receiving a dose of epinephrine, Haggard's cardiac rhythm changed to pulseless electrical activity. *Id.* He received three more doses

2

of epinephrine but remained unresponsive. *Id.* He was pronounced dead at 10:39 AM at Philip Hospital. *Id.* at PageID 216.

He was transported to Rush Funeral Home where South Dakota Highway Patrolman Kyle Mobley drew blood samples at 11:40 AM. *Id* at PageID 217. Results from the South Dakota Public Health Lab were negative for alcohol and drugs. *Id.* at PageID 245, 246.

Trooper Jack Wagoner, also of the South Dakota Highway Patrol, reviewed electronic driver logs and found that Haggard was not in violation of the 11-hour, 14-hour, or 70-hour requirements of 49 C.F.R. § 395.3(a) and (b). Doc. 33-1, PageID 237.

## 2. The Autopsy

On July 18, 2016, three days after Haggard's death, Donald M. Habbe, M.D. performed an autopsy. Doc. 33-1, PageID 210. He attributed the death to occlusive coronary artery atherosclerosis with 80% narrowing of the left anterior descending (LAD) coronary artery and 60% narrowing of the left circumflex artery and right artery. *Id.* at PageID 211, 210.

As part of the autopsy, Dr. Habbe took blood samples, which revealed blood ethanol at 19mg/dL and hydrocodone at 4 ng/mL *Id.*

## 3. Haggard's Relevant Medical History

Haggard had sleep apnea. Doc. 33-4, PageID 291. He used a continuous positive airway pressure ("CPAP") machine, which doctors with the Garden City Hospital Sleep Disorder Center monitored. Doc. 33-5, PageID 331, 334. Review of periodic downloads showed Haggard's compliance with its recommended use. *Id.* at PageID 353. He confirmed that such was so when, during his last follow-up appointment on May 13, 2016 he related that he "loves his machine" and uses it every single night. *Id.* at PageID 333. The most recent CPAP download from June 3, 2016 to June 19, 2016, also reflects Haggard's 100% compliance. Doc. 33-2, PageID 267. The medical

examiner who certified Haggard to drive a commercial motor vehicle reviewed the latest compliance report as part of the medical examination on June 20, 2016. *Id.* at PageID 253.

Haggard has never been in a car accident because of sleepiness. Doc. 33-5, PageID 333.

Haggard also had diabetes mellitus. Doc. 33-4, PageID 323.

**STANDARD**

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is proper if the moving party demonstrates that there is no genuine dispute of material fact and that judgment must follow as a matter of law. Further, I must view all evidence in the light most favorable to the nonmoving party and draw any justifiable inferences in that party's favor, *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962), however, I am not required to draw "strained and unreasonable inferences" in favor of the nonmoving party. *Fox v. Amazon.com, Inc.*, 930 F.3d 415, 425 (6th Cir. 2019).

A dispute over a fact is genuine when a reasonable jury could decide the matter and enter a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material if its resolution could affect the outcome of the case. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

The showing of evidence necessary at the summary judgment stage changes depending on whether the moving party has the burden of proof:

> When the moving party does not have the burden of proof on an issue, the moving party need show only that the nonmoving party cannot sustain its burden at trial. But where the moving party has the burden, the moving party's showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.

*Calderone v. U.S.,* 799 F.2d 254, 259 (6th Cir. 1986), quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 887-88 (1984) (citations omitted).

If the moving party meets its burden, then the nonmoving party can defeat summary judgment with fact assertions that create a genuine dispute as to any essential element of the claim or defense in question. *Anderson* at 257. For the nonmoving party to succeed, doubts regarding the material facts must rise above the "metaphysical" level. *Matsushita Electric Industries, Co., v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

## DISCUSSION

Defendants K-Limited Carrier and Haggard's estate move for summary judgment on the basis of the "sudden medical emergency" (SME) doctrine.

A complete defense to a negligence claim, the SME doctrine provides:

> Where the driver of an automobile is suddenly stricken by a period of unconsciousness which he has no reason to anticipate and which renders it impossible for him to control the car he is driving, he is not chargeable with negligence as to such lack of control.

*Lehman v. Haynam,* 164 Ohio St. 595 (1956).

The defendants, who have the burden of proof, must show 1) that he was suddenly stricken by a period of unconsciousness; 2) that he had no reason to anticipate or foresee; and which 3) rendered it impossible for him to control his vehicle. *See Roman v. Estate of Gotto,* 99 Ohio St.3d 260, 272-73 (Ohio 2003).

### 1. Sudden, Unforeseeable Medical Emergency

The defendants here have set forth facts that establish that Haggard was stricken by a sudden cardiac event that he had no reason to anticipate and that rendered him unable to control the vehicle.

The coroner, Donald Habbe, M.D., determined that Haggard died from occlusive coronary artery atherosclerosis, in part based on his finding of significant narrowing in the left anterior descending (LAD) coronary artery. Doc. 33-1, PageID 211. He also determined that Haggard had an enlarged heart, or cardiomegaly. *Id.* at PageID 215. According to Dr. Habbe, either one of those conditions were sufficient to have caused Haggard's sudden cardiac death. *Id* at PageID 169.

At the time of the autopsy, Dr. Habbe was unaware that Haggard had sleep apnea. Doc. 33-1, PageID 171. He testified that knowledge of Haggard's sleep apnea at the time of the autopsy would not have changed his opinion that Haggard died of a sudden cardiac event. *Id.* at 176.

Dr. Stephen Factor, FCAP, FACC, the defendants' expert, confirmed some of Dr. Habbe's findings. Dr. Factor reviewed the microscopic slides prepared by Dr. Habbe during the autopsy. Doc. 33-7. He found that the left ventricle showed "acute subendocardial confluent ischemia with congested vessels adjacent to the ischemia, some of which contain neutrophils (PMNs) with focal adherence to endothelial cells." Doc. 33-7, PageID 380. The PMNs were found in the capillaries of the endothelial cells. *Id.* 381. He noted that the coronary artery was an incomplete section, and therefore was unable to estimate the percentage of narrowing but found "a fibrofatty plaque involving most of the section, with focal fresh red blood cells adherent to endothelial cells (EC) overlying the plaque, with a few of the EC sloughed off." *Id.* at 380.

Dr. Factor concluded that Haggard suffered a myocardial infarction (MI), based on the presence of "confluent hypereosinophilia (more intense staining with the red dye eosin used to stain the tissues) in the innermost layers of the ventricle (the subendocardium), extending across the wall," approximately one to two hours before, and suffered a fatal ventricular arrythmia moments before, the collision. *Id.*at 381.

He explained that all MIs begin in the subendocardium and progress across the ventricle toward the epicardium. *Id.* The presence of PMNs in the left ventricle is significant:

> [PMNs] are acute inflammatory cells that are attracted to the dead myocardium by the release of chemicals in the blood. They migrate to the capillaries, and then begin a series of events leading to the organization of the MI over time. Once they are present in the adjacent capillaries the PMNs begin to adhere to the capillary endothelial cells usually within the first two hours of the MI. Hence, the MI in Mr. Haggard was about 1-2 hours old because there were PMNs that focally adhered to capillary endothelial cells, in addition to the confluent hypereosinophilia of the myocardium and subendocardium.

*Id.*

The atherosclerotic plaque in the LAD coronary artery caused ventricular arrythmia. *Id.* Dr. Factor explained that ventricular arrythmia is most commonly in the form of ventricular fibrillation, pulseless electrical activity, or asystole. *Id.* The arrythmia causes a "cessation of left ventricular pumping and a sudden lack of blood flow to the brain which results in unconsciousness within seconds. *Id.*

The defendants have also shown that Haggard's sudden cardiac death was not foreseeable. Testimony from Haggard's family physician, David J. Everingham, M.D., established that he was not a smoker, Doc. 33-4, Depo. Tr. 35:10-12, did not drink, *Id.* at 35:13-14, did not have a family history of heart disease or coronary artery disease, *Id* at 35:15-18, did not have a family history of cardiac or cardiovascular issues, *Id* at 35:19-21, did not have a history of high blood pressure, *Id.* at 35:22-24, did not have a history of high cholesterol, *Id*. at 35:25-36:1, and had normal EKGs in 2014 and 2015. *Id.* at 36:7-16.

The defendants have provided evidence sufficient to establish that they are entitled to judgment as a matter of law. Now, the plaintiffs must point to facts in the record that create a

7

genuine issue of material fact as to the defendants' affirmative defense, sudden medical emergency.

Plaintiffs contend that the evidence shows Haggard was fatigued and sleepy while driving and that the combination of fatigue, alcohol, and drugs in Haggard's system caused him to lose control of the vehicle. *See generally* Doc. 35.

Plaintiffs have introduced an expert report from a forensic pathologist and neuropathologist, Dr. L.J. Dragovic, FCAP, FAAFS that disagrees with the findings of Dr. Habbe and Dr. Factor. Dr. Dragovic opined that Haggard died from positional/compression asphyxia after becoming entrapped in the tractor-trailer's sleeper berth. Doc. 35, PageID 745. He also stated that those with sleep apnea suffer from excessive daytime sleepiness and that alcohol and hydrocodone contributed to that sleepiness. *Id.*

The report is noteworthy for its strong use of inference. Dr. Dragovic made note that extrication of Haggard was prolonged, *Id.* at 743, inferred that the extrication was prolonged because Haggard was "entrapped" in the sleeper berth, and further inferred that Haggard was entrapped in such a position that he died from position/compression asphyxia with a naso-oral blockage component. *Id.* at 745.

Dr. Dragovic could not substantiate the coroner's autopsy findings and deduced from there that sleep apnea, "the most serious clinical condition Mr. Haggard was suffering from," was the only "reasonable and rational explanation for him losing the control of his semi trailer (sic)." *Id*. He further opined that "[o]ne should always bear in mind that the most pervasive manifestation of sleep apnea is excessive daytime sleepiness." *Id.*

Dr. Dragovic also offered an observation that sleep apnea and a combination of minute amounts of hydrocodone and ethanol could affect a person's central nervous system. He provides

8

that "[i]n this complex situation one must not cavalierly dismiss the potential for known central nervous system depressants present in Mr. Haggard's circulation in their active pharmacologic form (alcohol and hydrocodone) to contribute to the daytime somnolence mentioned above." *Id.*

This is the extent to which Dr. Dragovic discusses sleep apnea and the potential pharmacological effects of trace amounts of hydrocodone and ethanol. It appears that Dr. Dragovic cherry-picked his facts, completely ignoring the negative test results from a blood sample drawn one hour after Haggard's death, preferring instead to credit results from a blood sample drawn three days post-collision.

A trial judge, faced with a proffer of expert testimony, must determine whether the expert is proposing to testify to scientific knowledge that will assist a trier of fact to understand or determine a fact in issue. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 590-91 (1993).

In *Daubert*, the Supreme Court held that trial judges are required to make an initial determination "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. This inquiry requires me to assess the relevance and reliability of the expert's testimony. The relevance requirement ensures that there is a fit between the testimony and the issue to be resolved. *Greenwell v. Boatwright,* 184 F.3d 492, 496 (6th Cir. 1999).

As the Supreme Court has stated, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

The Sixth Circuit has held that expert testimony "is inadmissible when the facts upon which the expert bases his testimony contradict the evidence." *Lee v. Smith & Wesson Corp.,* 760 F.3d 523, 525 (6th Cir. 2014) (quoting *Greenwell v. Boatwright* at 497).

Here, Dr. Dragovic relies on an unsupported assumption that a person diagnosed with sleep apnea will certainly suffer from excessive daytime sleepiness. Prior to making his conclusions, Dr. Dragovic reviewed Haggard's prior medical records, including records related to his sleep apnea diagnosis and treatment. Doc. 35-3, PageID 741. The undisputed facts established from those medical records show that just two months prior to the collision Haggard complied with the use of his CPAP machine, he did not feel sleepy when driving, and had never had a car accident because of sleepiness. Doc. 33-5, PageID 333.

It is clear that Dr. Dragovic's opinion is not based on the factual record but rather on the unsupported assumption that a person diagnosed with sleep apnea will be excessively sleepy or fatigued, regardless of the severity of the condition and the treatment provided. This extraordinary leap, without any consideration or analysis of the actual circumstances of Haggard's condition, leaves too great a gap between the data and Dr. Dragovic's opinions, especially given that Dr. Dragovic is not a medical sleep specialist or a doctor who diagnoses and treats patients with sleep apnea.

Further, Dr. Dragovic's observation, that one should not "cavalierly dismiss the potential" for alcohol and hydrocodone to contribute to sleepiness stemming from sleep apnea, is just that – an observation, not a *Daubert*-qualified opinion. He offers no reasoning or analysis to form an opinion on whether alcohol and hydrocodone, in minute amounts and of uncertain time of ingestion would, to a reasonable degree of physiological certainty, have any effect on Haggard's alertness as he headed up the exit ramp to the Scenic Overlook.

As such, I find that Dr. Dragovic's report and testimony stemming therefrom would not be admissible at trial. The conclusory opinion that sleep apnea combined with alcohol and hydrocodone caused Haggard to lose control of his semi-trailer is entirely too speculative to pass *Daubert* muster.

### 2. Negligence of Haggard (Count I) and K-Ltd.'s Vicarious Liability (Count III)

Plaintiffs allege in Count I that Haggard was negligent when he lost control of his vehicle, thereby seriously injuring the plaintiffs. They allege in Count III that K-Ltd. is vicariously liable for Haggard's negligence. Count III is dependent on the outcome of Count I; if Haggard's actions were not negligent, K-Ltd. cannot be negligent.

The defendants have established that they can show, as a matter of law, a sudden medical emergency caused the accident and plaintiffs' injuries.

To overcome this showing, the plaintiffs must establish a genuine issue of material fact that precludes summary judgment on the basis of that defense.

Here, plaintiffs have pointed to their accident reconstruction expert's report to present a genuine issue of material fact:

> The most likely cause of the failure to detect and respond appropriately to the hazard posed by the parking area at the top of the ramp was some adverse psychophysical condition which hindered his ability to respond as a normally alert driver. However, based on the control inputs that Mr. Haggard made as he approached the area of the crash it was clear that he was still able to manipulate the vehicle controls, albeit not in a normally alert manner. The evidence in this case was consistent with the driver experiencing an adverse psychophysical condition which diminished the driver's ability to remain normally alert, but there was no evidence of a sudden disability causing loss of control of the vehicle.

Doc. 35-1, PageID 666.

The defendants' accident reconstruction expert, after analysis of the same Engine Control Module (ECM) data, also determined that Haggard's actions were inconsistent with normal driving characteristics but found that Haggard's actions were consistent with the coronary artery atherosclerosis emergency. Doc. 33-6, PageID 374.

Were the jury to credit plaintiffs' expert's opinion, based on objective data in the module, that the data shows inappropriate responses to the vehicle's movement approaching and after hitting the curb, that could lead a jury to reject the sudden medical emergency defense, which, in turn, would make K-Ltd. vicariously liable.

I therefore deny, pending further proceedings, the defendants' motion for summary judgment as to Counts I and III.

### 2. Negligence *per se*: Counts II, VI

Counts II and VI allege negligence *per se* for violations of state and federal statutes and Federal Motor Carrier Safety Regulations under 49 C.F.R. §§ 350-399. (Doc. 1, ¶¶ 18, 34). The complaint did not reference any specific statutes and alleged only unspecified violations in general under the Code of Federal Regulations. *Id.*

As to claims of negligence *per se*, the Ohio Supreme Court, in *Chambers v. St. Mary's Sch,* 82 Ohio St. 3d 563 (1998), distinguished duties arising from statutes from those arising from administrative rules.

Duties arising from statutes legislatively enacted and reflect public policy. Administrative agencies implement those public policies *via* the duties contained in administration rules and regulations. *Id.* at 564, 566-67.

In *Chambers,* the Court recognized that allowing violation of administrative rules to constitute negligence *per se* would "in effect bestow upon administrative agencies the ability to

propose and adopt rules which alter the proof requirements between litigants. Altering proof requirements is a public policy determination more properly determined by the General Assembly." *Id*.

The Court ultimately held that "the violation of an administrative rule does not constitute negligence per se." *Id.* at 568. The Sixth Circuit concurs. See *Parker v. Miller*, 2018 WL 3743981, \*7 (2018): "Ohio does not recognize negligence per se based on the violation of an administrative regulation."

Ohio federal district courts have held that in Ohio, a violation of a federal regulation is admissible as evidence of negligence only. *See*, e.g., *Gruenbaum v. Werner Enters.,* 2011 WL 563912, \*4 (S.D. Ohio 2011) ("While the Federal Motor Carrier Safety Regulations do not establish a heightened standard of care in Ohio, evidence of a violation of the Safety Regulations may be considered by the trier of fact as evidence of negligence."); *Earley v. United Airlines*, 2006 WL 2794971 (S.D. Ohio 2006) ("the violation of a Federal Aviation Administrative regulation, which is an administrative rule, is only evidence of negligence").

In response to defendants' motions for summary judgment, plaintiffs only stated that they had shown Haggard had used narcotics and alcohol, and consequently was, in conjunction with his sleep apnea, fatigued while driving, all violations of the Federal Motor Carrier Safety Regulations. Contrary to assertions made in the complaint, plaintiffs have not pointed to or referenced any violations of a statute that would support a finding of negligence *per se*.

Therefore, I grant defendants' motion as to Counts II and VI.

### 3. Strict Liability of K-Ltd. (Count IV)

The fourth claim in the complaint states that K-Ltd. is responsible for Haggard's actions because the truck displayed a placard showing that K-Ltd. is the registered owner of the vehicle.

Doc. 1, ¶ 25. Defendants addressed this claim in the motion for summary judgment, Doc. 33, PageID 161, plaintiffs failed to defend the claim in their reply brief.

The Sixth Circuit holds that plaintiffs who do not respond to meritorious arguments about a claim have abandoned that claim. *E.g., Brown v. VHS of Michigan, Inc.*, 545 Fed.Appx. 368, 372 (6th Cir. 2013). See *Hicks v. Concorde Career Coll.,* 449 Fed.Appx. 484, 487 (6th Cir.2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment); *Clark v. City of Dublin*, 178 Fed.Appx. 522, 524–25 (6th Cir. 2006) (failure to respond to arguments in a motion for summary judgment constitutes abandonment of the claim).

So it is here. Therefore, I decline to address the issue on the merits and grant partial summary judgment on this claim.

### 4. Negligent Hiring by K-Ltd. (Count V)

In Count V, plaintiffs allege that K-Ltd. negligently in hired, instructed, trained, supervised, and retained Haggard. Doc. 1, ¶ 27. To prevail on this claim, plaintiffs must establish: 1) the existence of an employment relationship; 2) the employee's incompetence; 3) the employer's actual or constructive knowledge of that incompetence; 4) the employee's act or omission that caused plaintiff's injuries; and 5) the employer's negligent in hiring, retaining, training, or supervising the employee proximately caused the plaintiff's injuries. *Watson v. City of Cleveland*, 202 Fed.Appx.844, 857 (6th Cir. 2006) (citing *Linder v. Am. Nat'l. Inc. Co.,* 155 Ohio App.3d 30, 798 N.E.2d 1190, 1197 (2003).

Defendants contend that plaintiffs offer "no facts to support a contention that Haggard was not properly qualified to drive a tractor-trailer for K-Ltd," Doc. 33, PageID 160 (citing that

Haggard had a valid CDL and valid, properly certified Department of Transportation (DoT) medical certification). *Id.*

Plaintiffs conceded in their opposition brief that "K-Ltd.'s knowledge of Haggard's medical history is not an issue and do not premise their negligent hiring and entrustment claims." Doc. 35, PageID 647.

Plaintiffs' claim for negligent hiring rests on Haggard's response to K-Ltd.'s pre-application questionnaire "knockout" question, that he had failed a DoT mandated drug test in the past. Doc. 35, PageID 647-48. Plaintiffs argue that K-Ltd.'s knowledge of Haggard's past failed drug test made it reasonably foreseeable that Haggard would violate federal regulations prohibiting him from driving with alcohol or narcotics in his system. *Id.* at PageID 648.

The record shows that K-Ltd. requires a prospective employee to submit information about past employment for ten years, a much more robust investigation than the three-year look-back required under 49 C.F.R. §§ 391.21 and 391.23. Doc. 35-4, PageID 751. Haggard's employment application shows that he provided information regarding past employment beginning in 1999, and past employment as a commercial driver beginning in 2009.

K-Ltd. requested alcohol and controlled substance information from those previous employers. *See generally,* Doc. 35-4. The results from those requests show that Haggard had not violated the alcohol and controlled substance prohibitions during any prior employment. *Id.* K-Ltd. was unable to acquire information about Haggard's prior employment between January 2010 and May 2010 with Detroit Logistics Company as the company had shut down. *Id* at PageID 788-89.

The record also shows that Haggard's most recent medical certification, required under 49 C.F.R. §§ 391.43, 391.45, shows that in response to two pertinent questions, "[d]o you currently

15

drink alcohol" and "[h]ave you ever failed a drug test or been dependent on an illegal substance," Haggard stated "No." *Id.* at PageID 808.

According to Ohio law, "[t]he primary issue in a negligent hiring case is whether the employer knew or should have known of the employee's criminal or tortious propensities." *Terek v. Finkbiner*, 2015 WL 5542535, *5 (N.D. Ohio 2015) (Knepp, MJ) (citing *Byrd v. Faber*, 57 Ohio St.3d 56, 62 (1991)). Then, the issue becomes whether a reasonably prudent person could foresee the employee's conduct, such that it should have prevented the employment relationship." *Id.* (internal citations omitted).

Under Ohio law, when a court is to determine the foreseeability of a criminal act, it "must look at the totality of the circumstances, and only when the circumstances are somewhat overwhelming can an employer be held liable." *Id. (*citing *Prewitt v. Alexson Servs., Inc.,* 2008 WL 3893575) (Ohio App. 2008) (citing *Evans v. Ohio State Univ.,* 112 Ohio App.3d 724, 742 (1997)).

Once again, speculation about the possible effect of drug/alcohol ingestion at some unspecified time, and without qualified opinion, underlies this claim. On that basis alone it is unsustainable.

Disregarding that consideration and viewing this claim in a light most favorable to plaintiffs, the record supporting the alleged negligent hiring is underwhelming. Other than the single notation that Haggard had, at some unspecified date beyond the three-year FMCSA look-back date, failed a DoT mandated drug test, the record has no support. Further, all responses K-Ltd. received from Haggard's prior employers state that he had not violated the alcohol and controlled substance prohibitions under subpart B of part 392 or 49 C.F.R. part 40.

Based on the information contained in the record, I can only conclude that no reasonable juror could find for plaintiffs as to the claim of negligent hiring/entrustment in Count V.

## CONCLUSION

For the foregoing reasons, it is hereby

ORDERED THAT: defendants' motions for summary judgment (Docs. 18, 20, 33, 34) be, and the same hereby are granted as to Counts II, IV, V, and VI, and denied as to Counts I and III.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge